UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES** | : Crim. No. 06-162 (TFH) |
| vs. | : |
| **FRANKLIN PETTIFORD** | : |

### SENTENCING MEMORANDUM

Defendant Franklin Pettiford, by and through counsel, Christopher M. Davis, respectfully moves this Honorable Court to sentence him in accordance with a 20:1 ratio for cocaine base to cocaine powder. Defendant submits the following memorandum in support of his request.

1. On November 29, 2006, Franklin Pettiford was convicted by a jury of one count of Unlawful Possession with Intent to Distribute (PWID) 5 grams or more of Cocaine Base. Pursuant to a stipulation entered into by the parties at trial, the actual quantity of cocaine base involved was 18.8 grams. The PSR documents a statutory mandatory minimum of 5 years and a guideline range of 78-97 months (criminal history category III – offense level 26).

2. The issue is whether Mr. Pettiford should be sentenced outside the advisory guideline range pursuant to 18 U.S.C. § 3553(a). Defendant submits that a crack to powder ratio of 20:1, rather than 100:1, should be utilized, and that this Honorable Court is empowered to do so given the advisory nature of the guidelines.

## **Advisory Guidelines**

## **Sentence Below Guidelines Warranted**

3. *United States v. Booker*, 125 S.C. 738 (2005), marked the end of twenty years of mandatory federal sentencing guidelines. Following *Booker*, the Court is no longer required to impose a Guidelines sentence in all case, and its sentencing decision will be reviewed for reasonableness. The core requirement of 18 U.S.C. §3553(a) is that the court impose "a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in § 3553(a), which provides no order of priority among the factors.

4. The factors outlined in § 3553(a) are as follows

* The nature and circumstances of the of the offense and the history and characteristics of the defendant 18 U.S.C. § 3553(a)(1);

* the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for he offense," 18 U.S.C. § 3553(a)(2)(A);

* the need for the sentence imposed "to afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B);

* the need for the sentence imposed "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C);

* the *need* for the sentence imposed "to *provide the defendant with needed* educational or vocational training, *medical care*, or other correctional treatment in the most effective manner, 18 U.S.C. § 3552(a)(2)(D);

* the kinds of available sentences available, 18 U.S.C. § 3553(a)(3);

2

> \* the guidelines in effect at the date of sentencing and any pertinent policy statements, 18 U.S.C. § 3553(a)(4) and (5);
>
> \* "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6);
>
> \* "the need to provide restitution to any victims of the offenses," 18 U.S.C. § 3553(a)(7).

5. Although the Guidelines are no longer mandatory, a district court must still "consult the Guidelines and take them into account when sentencing. *Id.* at 767. In United States v. Hughes, 401 F.3d 540, 546 (2005), the Fourth Circuit laid out the following roadmap for trial courts:

> In the wake of *Booker,* therefore, the discretion of a sentencing court is no longer bound by the range prescribed by the guidelines. Nevertheless, a sentencing court is still bound to "consult [the] Guidelines," and take them into account when sentencing," *id.* at 767. Consistent with the remedial scheme set forth in *Booker,* a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in § 3553(a) before imposing the sentence. *See id.* at 764-65. If the court imposes a sentence outside the guideline range, it should explain its reasons for doing so. In light of the excision of [18 U.S.C.] §3742(e) by the Supreme Court, we shall affirm the sentence imposed as long as it is within the statutorily prescribed range, *see Append*, 540 U.S. at 490, and is reasonable, *see Booker,* 125 S.C. at 767.

401 F.3d at 546-47. In United States v. Pickett, __ F.3d __, 2007 WL 445937 at p. 4 (D.C. Cir. Jan. 13, 2007), our Court of Appeals very recently embraced the same analytical framework.

6. A district court's sentencing decision will be reviewed for reasonableness, taking into consideration the factors set forth in 18 U.S.C. § 3553(a). Pre-Booker authority supports the view that appellate courts should give considerable deference to

a district court's sentencing decisions - provided the record shows that those decisions are based on a careful analysis of the factors set forth in § 3553(a) and an explanation of why those factors support the sentence imposed. *See e.g.*, *United States v. Diaz-Fillafane,* 874 F.2d 43 (1st Cir. 1989); *United States v. Mendez-Colon,* 15 F.3d 188, 191 (1st Cir. 1990); *United States v. Summers,* 893 F.2d 63, 66 (4th Cir. 1990).

**Defendant and Offense Characteristics**

7. Under *Booker*, this Court has the authority to and should sentence Franklin Pettiford to the statutory mandatory minimum of 60 months. The nature and circumstances of the offense augurs well to imposing a sentence less than the guidelines suggest. This is a simple street level drug case that made its way into federal system for no reason other than the defendant happened to have stumbled into an investigation of another suspect. Pettiford was then apparently targeted as a potential cooperator. Mr. Petiford declined to avail himself of the benefits of a cooperation agreement, a choice that the Sentencing Guidelines specifically preclude any adverse consequences to flow from exercising. U.S.S.G §5K1.2. In the absence of this unfortunate turn of events, Mr. Pettiford would have certainly been prosecuted in the Superior Court and consequently would have had an advisory guideline range of well below the 60 month statutory mandatory minimum. On these facts, a sentence of 60 months reflects the seriousness of the offense, while at the same time, provides just punishment.

**100:1 Crack/Powder Disparity**

8.  The Court should reduce Mr. Pettiford's 78-97 month guideline range to account for the 100:1 crack/powder disparity built into the offense level for offenses involving crack cocaine. As set forth below, the dramatic disparity between sentences for powder and crack cocaine is unwarranted. If that disparity is reduced to 20:1, as advocated by the Sentencing Commission itself, Mr. Pettiford's offense level would be a 22, with a subsequent guideline range of 51 to 63 months.[1]

9.  The argument against imposing a sentence that incorporates the 100:1 crack/powder ratio is based primarily upon the Sentencing Commission's own disavowal of the basis for that disparity. The Commission has issued several reports discounting the disparity.

   **1. The 1995 Report**

10.  In February 1995, the Commission issued the first report, <u>Special Report to the Congress: Cocaine and Federal Sentencing Policy</u> (Feb. 1995) ("1995 Report"). The Report repudiated the still-existing crack sentencing structure.

11.  The 1995 Report is a comprehensive study, which analyzes and considers the appropriate level of punishment to be imposed for crack offenses by the very agency charged by Congress to make sentencing determinations and recommendations. <u>See</u> 28 U.S.C. § 994. The report analyzes each factor perceived to be relevant to the distinction between crack and powder cocaine. Many of the factors

---

[1] This number is obtained by calculating the offense level after converting the cocaine base pursuant to a 20:1 cocaine base to cocaine powder ratio (20 x 18.8 = 376 grams of powder cocaine = offense level 22).

were found to provide no support for a higher penalty for crack. Of "[t]he factors that suggest a difference between the two forms of cocaine," however, the Report concludes that they "do not approach the level of a 100-to-1 quantity ratio." 1995 Report at xiv.

12. Analyzing information not considered at the time the existing ratio was adopted, the Commission found that the 100-to-1 penalty ratio (I) cannot be justified by the physiological effects of the two forms of cocaine, 1995 Report at 182-83; (ii) has a disparate impact on blacks (in the last fiscal year for which data was available, 88.3% of crack defendants were black, 7.1% were Hispanic, and only 4.1% were white), Crack Report at 161, Table 13; (iii) creates higher penalties for street dealers than for their more culpable supplier, Crack Report at 174; (iv) effects a double punishment on crack defendants in light of subsequent guideline changes, 1995 Report at xv; and (v) creates extraordinary disparities given the street values of the two forms of cocaine.[2] 1995 Report at 173, Table 19.

13. The 1995 Report concludes that the 100:1 ratio should be eliminated and replaced with specific sentence enhancements more closely tailored to the supportable harm associated with some crack cocaine offenses. The Report states:

> The Sentencing Commission shares congressional and public concern about the harms associated with crack cocaine - - both to users and to the society as a whole - - including the violence associated with its distribution, its use by juveniles, the involvement of women and juveniles in its distribution, and its addictive potential. However, the Sentencing Commission concludes that Congress's objectives with regard to punishing crack cocaine trafficking can be achieved more effectively without relying on the current federal sentencing scheme for crack cocaine

---

[2] For example, at offense level 18, the street value of cocaine base was $115. The street value of powder cocaine at the same offense level was $10,700. 1995 Report at 173, Table 19.

offenses that includes the 100-to-1-quantity ratio. 1995 Report at xiv.

14. By subsequently promulgating proposed amendments to the crack guidelines, the Commission acknowledged that it had not adequately considered factors bearing on the 100:1 sentencing disparity between crack and powder cocaine before enacting the guidelines presently in effect and in light of changes to other guidelines specifically addressing harms associated with some crack offenses. In short, "the Commission concluded that sufficient policy bases for the current penalty differential do not exist."

15. With respect to the crack cocaine guidelines, the 1995 Report demonstrated that the Commission by its own admission overlooked a number of factors, which are relevant to the statutorily defined sentencing purposes. The Commission acknowledged this in the 1995 Report and in its submission to Congress of a guidelines amendment proposing the equalization of the crack/powder cocaine penalties. 60. Fed. Reg. 25, 074 (May 10, 1995). The Commission admitted that its guidelines for crack cocaine offenses fail to consider "characteristics of the offense and the offender" other than "the quantity and form of cocaine." 1995 Report at I. "In a given case," other characteristics "can be equally or more important" to the determination of the "appropriate punishment." Id.

16. Among the factors that the Commission stated that it had not adequately considered are: (1) the geographic range of a defendant's illegal activity; (2) the profit to be reaped by a defendant; (3) a defendant's role as a retail street dealer rather than a

7

wholesale distributor; (4) the lack of violence associated with the offense; (5) the absence of a weapon; (6) the flattening and inversion of penalties vis a vis cocaine suppliers; (7) the absence of juveniles in the offense; and (8) the lack of psycho pharmacologically induced crime.  1995 Report at 168-175; 193-197.  Some of these factors were not adequately considered because they are subsumed in the current ratio although they may not be present in most cases or in a given case; other factors, when present in a case, are being doubly punished because of separate enhancements for the factor.  Id. at 193-197.

      17.  The 1995 Report had also noted that there was some evidence suggesting that more violence was associated with trafficking and use of crack cocaine than with powder cocaine but that the evidence did not suggest that the increased level of violence "justifies a ratio as large as 100-to-1."  1995 Report at 197.  Indeed, the data demonstrated that the form of cocaine involved in an offense is not as accurate an index of a defendant's dangerousness or propensity for violence as are the guideline enhancements expressly designed by the Commission to capture such characteristics. Id. at 166.  Significantly, separate guideline enhancements did not exist when Congress first enacted mandatory minimums in 1986.  "[T]o the extent that the guidelines now provide a punishment for some of those same factors subsumed in the ratio, those factors generate an enhancement both through an increased ratio differential and through guideline adjustments.  In short, [crack cocaine defendants] are doubly punished through the interplay of the two structures."  Id. at 196.  The Commission concluded that the use of enhancements based on injury to victims, violence,

possession of a weapon, and the like is a "distinctly fairer" approach than a penalty scheme that "relies exclusively or primarily on a quantity ratio to distinguish among offenders warranting greater punishment . . . " Id. at 199.  The Commission acknowledged that the crack guidelines do not promote 'fairness' or 'just punishment' "because they punish less culpable crack dealers more severely than more culpable cocaine dealers and suppliers" and that "no policy basis for the present 100:1 sentencing differential exists".

18. As discussed above, the Commission, shortly after issuing the 1995 report, proposed a guideline that would have equalized the amounts of crack and powder under the guidelines.  Congress voted to disapprove this amendment, but directed the Commission to further study the matter.

### 2. The 1997 Report

19. In April 1997, the Commission issued its second report, Special Report to the Congress: Cocaine and Federal Sentencing Policy (April 1997) ("1997 Report"). This 1997 Report also concluded that the crack/powder sentencing disparity was unwarranted.

20. In the 1997 Report the Commission carefully considered each factor listed in the congressional directive and evaluated current federal cocaine sentencing policy in relation to congressional goals for drug offense sentencing.  The goals suggested that those who traffic in either powder or crack cocaine should be sentenced severely but that the current penalty differential between powder and crack cocaine sentencing must be reduced.  See 1997 Cocaine Report at 3.  The Commission concluded that the five-

gram trigger for crack cocaine is "over inclusive" because it is indicative of a retail or street-level dealer rather than a mid-level or serious drug trafficker. Id. at 5. It further noted that if a street-level seller possessed a gun or engaged in violence in connection with such a sale, a sufficiently severe sentence could be imposed by virtue of specific guideline enhancements; but the five-year mandatory minimum penalty should not be triggered by such a small quantity. See id. at 506. The Commission also found that by 1997 nearly 90 percent of those convicted in federal courts for crack cocaine distribution were African Americans, while the majority of crack cocaine users were White. See id. at 8. As a result, the sentences are "harsher and more severe for racial the minorities than others," and the current penalty structure "results in a perception of unfairness and inconsistency." Id.

21. After reviewing all the data related to the stated congressional goals for federal drug policy, the Commission again concluded that Congress' objectives can be "achieved more effectively without relying on the current federal sentencing scheme for cocaine offenses that includes the 100-to-1 quantity ratio." 1997 Cocaine Report at 9. It unanimously reiterated its original core finding that, although research and public policy may support somewhat higher penalties for crack cocaine than for powder cocaine, a 100-to-1-quantity ratio simply "cannot be justified." Id. at 2. In coming to this conclusion, the Commission balanced the conflicting goals of congressional and public concern about the harms associated with both forms of cocaine - including the potential violence associated with its distribution in some cases, its use by juveniles, the involvement of juveniles in its distribution, and it addictive potential. See id. at 9. The

Commission again recommended that Congress revise the federal statutory scheme for crack and powder cocaine offenses because hundreds of people continue to be sentenced under an unfair law. See id. at 8-9.

### 3. The 2002 Commission Report

22. The Sentencing Commission recently issued a new Report to the Congress: Cocaine and Federal Sentencing Policy (May 2002) ("2002 Report"). In it, the "Commission again unanimously and firmly concludes that the various Congressional objectives can be achieved more effectively by decreasing substantially the 100-to-1 drug quantity ratio." Id. at viii. In reaching this conclusion, the Commission debunked a number of myths upon which the original disparity was apparently based. The Commission made four main findings. First, it found the current penalties exaggerate the relative harmfulness of crack cocaine. Second, the current penalties sweep too broadly and apply most often to lower level offenders. Third, the current quantity-based drug sentencing system overstates the seriousness of most crack offenses and fails to provide adequate proportionality. Fourth, the Commission concluded that the severity of the current penalties mostly impacts minorities. Id. at v-viii. The Commission proposed a model guideline amendment to remedy the problems with extensive modifications. Id. at A-1 to A-10.

23. With respect to race, the Commission stated:

> The overwhelming majority of offenders subject to the heightened crack cocaine penalties are black, about 85 percent in 2000 (see Chapters 5 and 8). This has contributed to a widely held perception that the current penalty structure promotes unwarranted disparity based on race. Although this assertion cannot be scientifically evaluated, the Commission finds even the perception of racial

>disparity problematic because it fosters disrespect for and lack of confidence in the criminal justice system. Moreover, to the extent that the 100-to-1-drug quantity ratio is shown to result in unduly severe penalties for most crack cocaine offenders, the impact of the severity falls primarily upon black offenders.

Id. at viii. The Commission further stated:

>One of the key issues surrounding the debate concerning the different penalty structures for crack cocaine offenses and powder cocaine offenses relates to the racial composition of federal crack cocaine offenders. The overwhelming majority of offenders subject to the heightened crack cocaine penalties are black, about 85 percent in 2000. This has contributed to a widely held perception that the current penalty structure for federal cocaine offenses promotes unwarranted disparity based on race.
>
>In order to evaluate whether the crack cocaine penalties disproportionately impact blacks, data regarding the racial composition of the entire population of crack cocaine traffickers would be required. For example, if 85 percent of federally convicted and sentenced crack cocaine traffickers are black; the fact that the same percentage of all crack cocaine traffickers are black would tend to undermine the assertion of unwarranted disparity based on race. On the other hand, if 85 percent of federally convicted and sentenced crack cocaine traffickers are black, the fact that some lower percentage of all crack cocaine traffickers are black would tend to support the assertion of unwarranted disparity based on race. Although data regarding the racial composition of crack cocaine <u>users</u> are available, such data do not exist for crack cocaine <u>traffickers</u> generally. As a result, this assertion cannot be evaluated scientifically.
>
>Nevertheless, the Commission finds even the perception of racial disparity to be problematic. Perceived improper racial disparity fosters disrespect for and lack of confidence in the criminal justice system among those very groups that Congress intended would benefit from the heightened penalties for crack cocaine.
>
> * * *
>
>The fact that those same communities and many of their representatives now seek change in the federal cocaine penalty structure suggests a critical re-examination of the current penalty structure may be warranted.

> Furthermore, to the extent that the preceding analysis has shown that the 100-to-1-drug quantity ratio results in unduly severe penalties for most crack cocaine offenders, the effects of the severity fall primarily upon black offenders.

Id. at 102-103.

### 4. The 2004 Assessment

24. Even more recently, in its report, <u>Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform</u> (November 2004), the Commission again criticized the harsher penalties for crack. The Assessment again noted the stark racial impact of this disparity:

> In 2002, 81 percent of the offenders sentenced for trafficking the crack form of cocaine were African-American. The average length of imprisonment of crack cocaine was 119 months, compared to 78 months for the powder form of the drug. Average sentences for crack cocaine were 25 months longer than for methamphetamine and 81 months longer than for heroin.

Id. at 131 (footnotes omitted).

The Assessment further noted that:

> The Commission has previously reported that the harms associated with crack cocaine do not justify its substantially harsher treatment compared to powder cocaine.
> . . .
> For these and other reasons, the Commission has repeatedly recommended that the quantity thresholds for crack cocaine be revised upward. In 2001 (USSC, 2001) the Commission recommended that the crack threshold be raised to at least 25 grams from 5 grams, replacing the current 100-to-1 ratio with a 20-to-1 ratio.

Id. at 132. The Assessment concluded that:

> As shown in Figure 4.10, this one change to current

>sentencing law would reduce the gap in average prison sentences between Black and White offenders by 9.2 months. Among drug trafficking offenders only, the current gap is even wider -- 92.1 months for Blacks compared to 57.9 months for Whites -- and the reduction would be even greater, 17.8 months. This one sentencing rule contributes more to the differences in average sentences between African-American and White offenders than any possible effect of discrimination. Revising the crack cocaine thresholds would better reduce the gap than any other single policy change, and it <u>would dramatically improve the fairness of the federal sentencing system</u>.

Id. (emphasis added).

### 5. **Cases**

25. The D.C. Circuit rejected the argument that a downward departure under the then-mandatory guidelines was permissible because of the unwarranted crack/powder sentencing disparity. See <u>United States v. Anderson</u>, 82 F.3d 436 (D.C. Cir. 1996). In <u>Anderson</u>, the defendant relied heavily upon the 1995 report to argue that such a departure was warranted. The court in <u>Anderson</u>, however, relied primarily upon the fact that the 1995 Report was not assigned official status under 18 U.S.C. § 3553(b), and thus the 1995 Report had essentially no bearing in departure analysis under the mandatory guidelines system. <u>Id</u>. at 440-41.

26. Notably, however, the majority in <u>Anderson</u> declined to address an argument that the disparity violated § 3553(a)'s requirements, claiming the defendant had not raised the issue. <u>Id</u>. at 441. The court noted that § 3553(a) had to be read in light of the express requirements of § 3553(b). <u>Id</u>.

In dissent in <u>Anderson</u>, Judge Wald focused on § 3553(a):

>The majority's analysis is flawed because it stops short of asking the critical question: whether these cases fit into that very narrow

14

> category of circumstances where a policy statement or official commentary is <u>not</u> binding upon a sentencing court because it violates constitutional or statutory dictates. In light of the findings in the Special Report, it seems to me that applying the atypicality requirement to deny departure authority would violate a federal statute - - the Sentencing Reform Act itself. Section 3553(a) of the Sentencing Reform Act sets forth the factors a court must consider when sentencing under the guidelines, directing courts to impose a sentence which is "sufficient, but not greater than necessary" to achieve the goals of sentencing.
>
> . . .
>
> In usual cases, it is reasonably assumed that the Commission's guidelines adequately reflect these purposes. But that assumption falls apart in the exceptional situation where the Commission itself admits that its guidelines do not accomplish the four purposes of § 3553(a). To blindly adhere to the atypicality requirement even if doing so would plainly violate the mandates of § 3553(a) is to give no meaning at all to that provision - - an interpretation which would be at odds with basic tenets of statutory construction.
>
> . . .
>
> The nub of the problem here, of course, is that the *Special Report* is a startlingly forthright admission by the Sentencing Commission that its crack guidelines violate § 3553(a)'s instructions that a court impose a sentence "sufficient, but not greater than necessary" to "reflect the seriousness of the offenses" and "provide just punishment."
>
> . . .
>
> The[ ] acknowledgments by the Commission itself - - that crack sentences raise "[i]ssues of 'fairness' or 'just punishment'" because they punish less culpable crack dealers far more severely than more culpable cocaine dealers and suppliers, and that no policy basis for the present 100:1 sentencing differential exists - - make it impossible to square the crack guidelines with the sentencing purposes of § 3553(a). For this reason, I believe a district court is authorized to disregard the atypicality requirement and, though it should proceed cautiously in this largely unchartered terrain, to grant a departure if it determines that application of the crack guidelines to the case it before it will, in fact, plainly violate § 3553.

<u>Id</u>. at 446-48 (Wald, J., dissenting).

27. In <u>In re Sealed Case</u>, 292 F.3d 913 (D.C. Cir. 2002), defendant argued that the Supreme Court's decision in <u>Koon v. United States</u>, 518 U.S. 81 (1996), had

overruled <u>Anderson</u>.  The court, however, continued to adhere to the heartland analysis of § 3553(b), and relying upon <u>Anderson</u>, reaffirmed its decision that a departure for the crack/powder disparity could not be imposed.

      28.  The decision in <u>Booker</u> has eviscerated the rationale for the holdings in <u>Anderson</u> and <u>In re Sealed Case</u>.  The Supreme Court in <u>Booker</u> excised § 3553(b)(1), the provision upon which the majority in <u>Anderson</u> relied for its decision, and made the guidelines advisory and a factor to be considered along with all the other factors set forth in § 3553(a).

      29.  In <u>United States v. Pickett</u>, __ F.3d __, 2007 WL 445937 at p. 7 (D.C. Cir. Jan. 13, 2007), our Court of Appeals finally concluded that it is authorized to hold, and did hold, "that a district court, in sentencing a defendant, may properly take into account the fact that the 100 – to – 1 ratio embedded in the Sentencing Guidelines for crack-to-powdered cocaine offenses bears no meaningful relationship to a defendant's culpability." (Rogers, J. concurring ).  In <u>Pickett</u>, the issue was "whether the district court committed legal error when it declined to consider the 100-to-1 ratio perpetuated in § 2D1.1 of the Guidelines and the problems it raises in sentencing crack cocaine dealers like Pickett." Id. at 4.  The Court answered the question in the affirmative and remanded the case for consideration of all of the factors discussed <u>supra</u>.  The <u>Pickett</u> court specifically overruled <u>Anderson.</u>  Id. at 3.

      30.  This Court should apply the 20:1 ratio for all of the reasons outlined the reasons that the Sentencing Commission have repeatedly found to warrant anything but strict adherence to the now defunct madatory crack cocaine guidelines.  As noted, the

resulting sentencing range would be 51 to 63 months.  Prior to <u>Pickett</u>, Judge Friedman had ruled that he had the authority to sentence according to the 20:1 ratio in *United States v. Michael Anthony Brown,* Crim. No. 04-385;[3] *United States v. Robert S. Harris*, Crim. No. 03-539.  Judge Richard Roberts, as well as Judge Robertson and Judge Huvelle also use this ratio.[4]

### Conclusion

31. Franklin Petttiford is a 34-year-old African American male.  He came before this Court more by happenstance than plan.  In most jurisdictions, it is safe to assume that his offense would not have been federally prosecuted.   Had he been prosecuted in the State system (Superior Court), his advisory guideline range would have been less than the statutory mandatory minimum of 60 months.

32. The defendant moves this Court to adhere to the principles adopted by the <u>Pickett</u> court and sentence him to the 60-month mandatory minimum mandated by law.

Respectfully submitted,

## <u>Christopher M. Davis</u>

Christopher M. Davis #385582
Davis & Davis
The Lincoln Building
514 10th Street, N.W. - Ninth Floor
Washington, D.C. 20004
202-234-7300

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of this Motion was electronically served (ECF)

---

[3] A copy of Judge Friedman's March 7, 2006 oral opinion has not been filed electronically.  However, counsel can provide the court a copy upon request.

[4] Judge Bates, Judge Collyer and Judge Kennedy sentence according to the 100:1 ratio. Judge Bates opined on the issue in *United States v. John Doe*, 412 F.Supp.2d 87 (D.D.C. 2006).

upon Edward A. O'Connell on this 15th day of February 2007.

<u>Christopher M. Davis</u><br>Christopher M. Davis